## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

JOSEPH R.,                          :
      Plaintiff,                  :
                     :
      v.                          :      C.A. No. 24-264-PAS
                     :
FRANK BISIGNANO,                    :
Commissioner of Social Security,    :
      Defendant.                  :

### MEMORANDUM AND ORDER

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On February 26, 2020, Plaintiff Joseph R., a "younger" individual, filed his second set[1] of applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act, alleging disability beginning on November 1, 2019, based on anxiety, depression, low back pain, sciatica, bulging disc, insomnia, joint pain, fatigue, Gilbert's Syndrome, headaches, and sickle cell trait. After these claims were denied – initially, on reconsideration and by an administrative law judge ("ALJ") – Plaintiff filed an appeal in this Court on September 7, 2022. Joseph R. v. Kijakazi, 22-cv-326WES. As confirmed by the Order of the Appeals Council, with the assent of Plaintiff and the Commissioner, this matter was voluntarily remanded (see 22-cv-326WES, ECF No. 11) in February 2023 for further proceedings before a second ALJ. The remand required consideration, inter alia, of the opinion of a treating orthopedic physician, Dr. George Pasquarello, that Plaintiff's residual function capacity[2] limits him to lifting no more than 25 pounds and sitting no more than thirty minutes at

---

[1] The first set had been denied at the initial phase in April 2010.

[2] RFC refers to "residual functional capacity." It is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. §§ 404.1545(a)(1).

once, with an "ad lib" sit/stand option and no "repetitive bending and twisting."  Tr. 117-21.

Meanwhile, with the 2020 applications pending, also on September 7 (and 8), 2022, Plaintiff had

filed a new set of applications (Tr. 423-27) alleging disability based on back pain, sciatica, left

side neck pain, shoulder, arm and leg pain with numbness, fibromyalgia, joint pain, fatigue,

headaches, sickle cell trait, depression, anxiety, and memory and concentration problems.  Tr.

124.  In light of the 2022 applications, the Appeals Council further directed that, on remand, the

second ALJ should "consolidate the claims files, associate the evidence, and issue a new decision

on the consolidated claims."  Tr. 120.  The resulting record contains well more than twelve

hundred pages of medical records (Tr. 600-1859), as well as other material.

The second ALJ complied with the Appeal's Council directive and issued his decision on

March 6, 2024.  Tr. 4-27.  He found that Plaintiff's ability to work is severely impacted by

fibromyalgia, chronic fatigue syndrome, degenerative disc disease of the lumbar spine,

labyrinthine hypofunction, migraine, concussion, irritable bowel syndrome,

gastroenteritis/colitis, depression, anxiety, attention deficit/hyperactivity disorder ("ADHD") and

post-traumatic stress disorder ("PTSD"), but that sickle cell trait, Gilbert's syndrome and ocular

impairments are non-severe.  Based on his analysis of the evidence and the opinions/findings of

numerous medical/mental health experts/treating providers, the second ALJ found that Plaintiff

is significantly impaired and retains the extremely limited RFC to perform less-than sedentary

work with an every-hour sit/stand option and only frequent reaching with the left arm and

postural (including occasional stooping/bending), manipulative and environmental limits, as well

as with mental limits restricting him to simple tasks/instructions and little social contact.  In

reliance on the testimony of a vocational expert that there is work that an individual with this

RFC can perform, the ALJ found that Plaintiff has not been disabled at any relevant time.

Plaintiff challenges the second ALJ's decision for an array of reasons. First, he contends that, guided by the Supreme Court's recent decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), the Court should reset the standard of review and remand this case for further consideration in accordance with the remedial purpose of the disability portion of the Social Security Act. Second, Plaintiff argues that the second ALJ erred in how he dealt with the opinions and prior administrative findings of several of the Social Security Administration ("SSA") medical/mental health experts and treating providers. Third, in reliance on Sacilowski v. Saul, 959 F.3d 431, 440 (1st Cir. 2020), Plaintiff challenges the second ALJ's determination that Plaintiff's subjective statements about his physical and mental symptoms should be discounted, arguing that the ALJ failed to marshal substantial evidence that contradicts Plaintiff's testimony.

Now pending before the Court is Plaintiff's motion to reverse, to award benefits or for further proceedings, the decision of the Commissioner denying his SSI/DIB applications. ECF No. 10. Defendant has filed a counter motion for an order affirming the Acting Commissioner's decision. ECF No. 12. Both motions are before me on consent pursuant to 28 U.S.C. § 636(c).

## I.    Background

### A.    Plaintiff's History and Activities

Plaintiff is married and lives with his wife and two children. He completed college and earned a Master of Business Administration degree in 2017. Tr. 40-41, 45. Prior to the period of disability, Plaintiff worked, mostly self-employed, rehabilitating and selling houses, in sales promotion and as a bouncer. Tr. 230-35.

During the period of alleged disability, Plaintiff has performed volunteer work at the University of Rhode Island as a Master Gardener and (in 2022) worked for several months for a

neighborhood development program for which he received a stipend so he could pay student loans, although he stated he stopped this job because he "couldn't keep up." Tr. 10, 48-49, 936. The record contains other references to working. See Tr. 914 (in February 2021, reports "hard time at work"); Tr. 943 (reports working in May 2021); Tr. 1293-94 (reports working in February 2022); Tr. 1434 (reports working in December 2022); Tr. 1456 (prior to 2022 motor vehicle accident, reports "had a 'job' at AmeriCorps and felt he was making progress"); Tr. 1592 (reports "[t]aking a leave from work due to car crash"). As reflected in the record, Plaintiff also engages in other activities: for example, in 2019 "he flew to Northern CA on vacation"; in January 2020, he was back at the gym; in March 2020, he explained that it is hard for him to rest or find time alone because his wife is disabled and "relies on him for help with household difficulties and working with their two children"; in June 2020, he was spending time doing yardwork and moving boxes; in February 2021, he complained that his neck, shoulder and arm pain flared because he had been "lifting more at work," but also had been "going to the gym for two months" and been "more active in general"; and throughout the period, he reported going for occasional walks and attending church monthly. Tr. 750, 873, 848, 914, 1162, 1265, 1427. In his 2020/2022 function reports, Plaintiff stated that he helps to care for his children, shops in stores, drives (though "sometime I can not") and does chores and gardening. Tr. 480-87, 554-61. In his 2022 function report, Plaintiff stated that he had never been fired or laid off due to problems getting along with others, although in the 2020 report he (inconsistently) stated that he had been. Compare Tr. 486, with Tr. 559.

On November 12, 2022, Plaintiff was the restrained driver in a motor vehicle accident during which airbags did not deploy. Tr. 1402. He was ambulatory at the scene and did not seek medical treatment until the next day, complaining of "some left-sided neck pain and some mild

headache worsening over the past 24 hours." Tr. 1402; see Tr. 1402-05 (except for tenderness and decreased range of motion in left neck area – cervical/paraspinal/vertebral/trapezius – post-accident examination, including musculoskeletal, neurological and psychiatric, normal).

### B.    Plaintiff's Treatment for Physical Symptoms[3]

Beginning in 2019 and continuing in 2020, Plaintiff was treating with orthopedist Dr. George Pasquarello for low back pain and sciatica. Tr. 816. Dr. Pasquarello considered a 2019 x-ray of the lumbar spine that was normal and a 2019 MRI of the lumbar spine that showed degenerative disc disease with annular tear and disc bulge. Tr. 667-69. On examination, Dr. Pasquarello noted normal gait, normal strength, normal range of motion, and no tenderness except for the areas confirmed by the 2019 MRI, as well as a positive straight leg raise. Tr. 751-52, 811, 819. Dr. Pasquarello also performed a mental status examination (MSE"),[4] noting "normal mood and affect and active and alert." Tr. 751. Based on his examinations, on January 20, 2020, Dr. Pasquarello opined that Plaintiff was cleared to return to work, albeit with significant limitations, including an "ad lib" sit/stand option. Tr. 752-53. As treatment, Dr. Pasquarello prescribed gabapentin and an NSAID with home exercise. Tr. 752.

Also during 2019/2020, the record reflects that Plaintiff was frequently seen by his primary care providers at Thundermist complaining of joint pain/stiffness and fatigue. For

---

[3] This summary of the evidence of Plaintiff's treatment for physical symptoms, as well as the mental health summary that follows, does not come close to including all of the treatment sought and/or received by Plaintiff nor does it mention all providers involved with Plaintiff's care. Nevertheless, the Court reviewed carefully and has considered the entirety of this extensive record, including careful review of the portions of the record cited by both Plaintiff and Defendant in their helpful briefs.

[4] A mental status examination ("MSE") is an objective assessment of an individual's mental ability based on personal observation, where "experienced clinicians attend to detail and subtlety in behavior, such as the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation. . . . [; l]ike the physical examination, the Mental Status Examination is termed the *objective* portion of the patient evaluation." Roberta L. v. O'Malley, C.A. No. 23-234-PAS, 2024 WL 3886654, at *2 n.4 (D.R.I. Aug. 20, 2024) (internal quotation marks omitted).

example, in February 2020, Plaintiff reported "now better compared to before," although he continued to report "extreme fatigue." Tr. 725. On examination during that appointment, Plaintiff was observed to have no swelling or gait disturbance, full range of motion except for mild decreased motion in his knees from an old injury and "good eye contact, normal speech and thought[,] [g]ood insight and judgment." Tr. 725-26. This physician noted that Plaintiff had seen a rheumatologist but "no rheum dx made." Tr. 863. In April 2020, an APRN noted that Plaintiff's back injury had occurred "3 years ago" and that he "states has seen 4 orthopedists." Tr. 841-42. This APRN noted "significant anxiety around COVID"; she suggested follow-up with the treating psychiatric nurse practitioner (Nurse Bianchino). Tr. 841.

In late 2020, on referral to another rheumatologist, Dr. Deepan Dalal, Plaintiff was diagnosed with fibromyalgia based on Plaintiff's report of "pain, fatigue, memory fog along with IBS migraines is very suggestive of fibromyalgia"; thus, as Dr. Dalal wrote, he derived the diagnosis based on "clinical findings [that] are more consistent with fibromyalgia than anything else." Tr. 939. Dr. Dalal noted Plaintiff's lack of employment, but did not attribute it to the diagnosis or to pain or any other health impairment. Rather, as he wrote, "[Plaintiff] is also having issues with finding a job considering that there have been prior legal actions against him." Id. Dr. Dalal suggested aerobic activity. Id. On examination, Dr. Dalal noted that Plaintiff was cooperative with appropriate mood and affect, no synovitis, and no other findings including no findings of tender points. Tr. 940. Dr. Dalal recorded Plaintiff's report that the pain was diffuse but only occasionally "very severe." Id. Plaintiff had two more appointments with Dr. Dalal in 2021 during which Plaintiff pressed him to diagnostically explore the possibility that Plaintiff might have Lupus or Sjogren's syndrome, neither of which Dr. Dalal endorsed. Tr. 934. Instead, Dr. Dalal suggested Plaintiff seek a second opinion. Id.

6

In 2021, treatment with primary care providers continued for back and cervical pain, with referrals for physical therapy.  In August 2021, Plaintiff saw another rheumatologist, Dr. Aruna Tokas, for the second opinion.  Tr. 1082-83.  Dr. Tokas recorded Plaintiff's complaints of pain all over his body exacerbated by stress and overuse, as when bending to pick up his children; she noted the 2019 MRI findings, but also that back pain had improved and that Plaintiff cares for two children at home.  Tr. 1083.  On examination, Dr. Tokas observed normal strength despite Plaintiff's "questionable effort," negative straight-leg-raise, but pain in spinal area, although "without addition fibromyalgia tender points noted."  Tr. 1085.  She also noted that Plaintiff's reported "pain is out of proportion to exam findings in general."  Id.  Her opinion does not endorse fibromyalgia; rather, she found "he has chronic fatigue syndrome with some OA."  Tr. 1086.  She concluded her opinion:

> He could potentially be having hypochondriasis but its something that we dont typically diagnose as rheumatologist.  Therefore he needs no further rheumatological workup from my standpoint.

Id.  Also in 2021, Plaintiff was referred to a hematologist, Dr. David Stoll, for testing to consider Plaintiff's concerns about sickle cell trait and thalassemia.  Dr. Stoll ruled out thalassemia and found no need for any treatment of sickle cell trait.  Tr. 1275-81; see Tr. 1278 (testing "really quite normal").

In 2021 and continuing in 2022, Plaintiff was referred to neurologists, Dr. Judy Lui and Dr. Mason Gaspar, based on complaints of lumbar and cervical pain.  Dr. Lui interpreted Plaintiff's 2021 lumber spine MRI as "show[ing] some minimal findings," and the 2021 cervical MRI as entirely normal.  Tr. 1217, 1293.  She suggested a lower dose of gabapentin to prevent dizziness but made no treatment referrals because Plaintiff refused to be examined.  Tr.1217-22.  Dr. Gaspar saw Plaintiff in October 2022; he found no neuropathy or radiculopathy affecting

lower or upper extremities, normal gait/ambulation, normal mood, affect and speech, normal strength and other normal neurological findings, except for cervical and lumbar spine tenderness/decreased range of motion.  Tr. 1371, 1377-78.  He diagnosed myalgia and prescribed vitamins.  Tr. 1378.

Also in 2021, Plaintiff saw an otolaryngologist to explore his complaints of vertigo since a 2019 vacation in California.  On examination, the physician observed appropriate affect, normal attention and concentration, normal speech and normal gait.  Tr. 1162-76.  And during 2021, Plaintiff was seen by various gastroenterologists (including during an emergency room visit) based on his claim of abdomen pain and a past diagnosis of irritable bowel syndrome; all findings were normal.  Tr. 1104-58, 1200, 1205-08.

In 2022 and 2023, Plaintiff had appointments with yet another rheumatologist, Dr. Lewena Maher.  Like Dr. Tokas, on examination in December 2022, she found stiffness, otherwise made no findings, including that he "[d]oesn't have any tender points present."  Tr. 1433.  Nevertheless, Dr. Maher told Plaintiff she believes the diagnosis of fibromyalgia is "likely" based on her interaction with him.  Tr. 1434.  Her records do not reflect any treatment.

In late 2022, Plaintiff was in the motor vehicle accident.  In December 2022, soon after the accident, the primary care provider, Nurse Practitioner Charles Fraser, observed no acute distress, and tenderness in the cervical area with moderate pain on motion, and muscle spasm in the thoracic spine with moderate pain on motion.  Tr. 1345.  Importantly, Nurse Fraser observed no lumbar spine tenderness and normal mobility and curvature of the lumbar spine.  Id.  In response to the complained-of cervical pain radiating to the left arm, an x-ray and MRI of the neck were performed; these yielded no findings except for a trace bulge at C6-7.  Tr. 1607.  In late December 2022, based on complaints of light/sound sensitivity and headache, Plaintiff was

referred to a concussion clinic. Tr. 1383. Approximately one year later, this provider (in November 2023) noted that Plaintiff's symptoms from the accident were all improved, though headaches had not resolved, Tr. 1854-55, but that "[h]is worsening of symptoms is not consistent with typical post-concussion recovery and suggests contribution of other diagnoses to his symptoms." Tr. 1858. This provider offered no opinion about the cause or RFC impact of Plaintiff's symptoms during the post-accident period, writing that "[o]pinions regarding legal issues including causation, apportionment and disability can be sought through an independent medical examination provided by a separate physician who lacks a treatment relationship with this patient." Id.

Just before the ALJ hearing, in September 2023, Plaintiff presented to an orthopedic group complaining of low back pain that Plaintiff reported as "dating back several months," and that he had been in a "car accident last year." Tr. 1629. Injections were recommended, although the record does not reflect that any were administered. Tr. 1628-30.

### C.    Plaintiff's Mental Health Treatment

From February 2019 (before the alleged onset date) through April 2021, Plaintiff received regular specialized mental health treatment principally from a psychiatric nurse, Nurse Bianchino, as well as from several social workers in the practice. Nurse Bianchino's extensive treating notes reflect diagnoses of ADHD, insomnia and anxiety, with observations of cooperative behavior, normal speech, good eye contact, focused attention with prescribed medication, minimal depression and anxiety "at times." E.g., Tr. 734, 823, 905. Consistent with these benign observations, Nurse Bianchino opined in May 2021,[5] that Plaintiff was "rarely" unable to work in a "regular FULL TIME WORK SETTING." Tr. 946-49.

---

[5] The date of the Bianchino opinion appears in the Court Transcript Index, not in the opinion itself.

After May 2021, Plaintiff had a significant gap[6] in specialized mental health treatment until February 2023, when he began treatment with a psychologist, Dr. Steven Hershey, whom he saw at least nine times through August 2023.  Dr. Hershey consistently observed Plaintiff to be cooperative, alert, with appropriate speech (except once while describing a family issue/crisis, when it was "rapid and tense") and adequate mood, though mood was once noted as "flat," and occasionally anxious.  E.g., Tr. 1443-44, 1453-57, 1476-77.  In his opinion, signed in October 2023, Dr. Hershey noted that he was not prescribing medication and that he was "unable to answer" questions regarding the severity of Plaintiff's symptoms.  Tr. 1735-38.  In addition, psychologist Dr. Marcia Liss saw Plaintiff on June 1, 2023, for an initial psychological evaluation.  Tr. 1536-44.  She concluded that there was no need for her to schedule further appointments based on ongoing psychotherapy with Dr. Hershey; she observed cooperative manner, normal speech, fluid language, intact attention, but poor eye contact, constricted affect and walking stiffly with slow movements.  Tr. 1541-42.

Mental health observations by non-mental health specialists are consistently benign. E.g., Tr. 725-26 (in February 2020, primary care provider observed "good eye contact, normal speech and thought[,] [g]ood insight and judgment."); Tr. 751, 756 (at appointments to address low back pain, observed to have "normal mood and affect and active and alert" and to be "very pleasant"); Tr. 940 (at appointment to address low back pain, observed to be alert, oriented, coherent and cooperative, with appropriate mood and affect); Tr. 1371, 1377-78 (at October 2022 appointment, Plaintiff displayed normal mood, affect and speech); Tr. 1388 (at

_____

[6] During this gap, Plaintiff received mental health treatment – principally prescribed medication – from primary care providers.  For example, in July 2021, the primary care provider noted that an antihistamine medication was "working well" to address reported depression and anxiety.  Tr. 1235.  In addition, Dr. Hershey's October 11, 2023, opinion notes that there was an "initial session" on November 28, 2022, although no medical record reflects such an appointment.  Tr. 1735.

appointment to assess post-car crash headache, observed as alert, oriented, speech fluent and well-articulated, no issues with attention, but slowed processing speed); Tr. 1433 (at appointment to treat fibromyalgia and chronic fatigue, observed to be "conversant, pleasant").

### D.    Plaintiff's Subjective Statements

At the hearing before the first ALJ, Plaintiff testified that he cannot work due to pain "throughout [his] body" caused by severe sciatica, fibromyalgia, fatigue, depression and anxiety. Tr. 235-39.  At the hearing before the second ALJ, Plaintiff testified that he cannot work because of pain in his "back and stomach" and "generalized body pain," as well as ("lately") in his head and running down his left leg due to the motor vehicle accident on November 13, 2022, which he alleged aggravated existing symptoms and caused new ones, including headaches.  Tr. 42-44, 51. Plaintiff also said his ability to work is impacted by "mental health issues."  Tr. 44.  When prompted by his attorney, Plaintiff supplemented this testimony, alleging that he has panic attacks and that the motor vehicle accident caused a concussion.  Tr. 49-55.  At the end of the second ALJ hearing, Plaintiff was asked, "[i]s there anything we did not talk about today as far as your ability to work that you think would be important to add?"  Tr. 55.  He answered:

> The Guillain-Barre Syndrome,[7] I think, paired with my other things.  This
> weekend, I spent a lot of time in the bathroom with bile coming out both my ends,
> and having major issues and things that are not really being addressed."

Id.

### E.    Opinions/Prior Administrative Findings

---

[7] According to the National Institute of Neurological Disorders and Stroke website, Guillian-Barre Syndrome is a "rare neurological disorder" that can be "very mild" but that can also cause "nearly devastating paralysis." https://www.ninds.nih.gov/health-information/disorders/guillain-barre-syndrome.  There is no treating record reflecting that Plaintiff was ever diagnosed with this serious disorder, nor does any provider appear to have considered it as a potential diagnosis for Plaintiff.  Before this Court, Plaintiff has not relied on it as an impairment that impacted his ability to work.

With the consolidation of Plaintiff's 2020 and 2022 applications, the relevant record contains twelve opinions/prior administrative findings from medical/mental health experts and treating providers. For the pre-remand portion of the record, there are opinions and prior administrative findings from seven treating providers/experts as follows:

- On January 20, 2020, the treating orthopedic physician Dr. Pasquarello opined that Plaintiff can return to work, albeit with limits on lifting, repetitive bending/twisting and sitting for more than thirty minutes at a time with "ad lib" sit/stand option. Tr. 752-53.

- On May 26, 2021, treating psychiatric nurse, Nurse Bianchino, opined that Plaintiff's ability to work or function is rarely or never adversely impacted by his mental impairments. Tr. 946-49.

- In April/May and October 2020, two non-examining SSA physician experts (Dr. Henry Laurelli and Dr. Mitchell Pressman) and two non-examining SSA psychologist experts (Dr. Pamela Steadman-Wood and Dr. Clifford Gordon) examined the records and found Plaintiff able to perform at least light exertional work with postural limits on climbing and stooping/bending, and moderate limits on the ability to interact with the public, supervisors and coworkers. Tr. 71-77, 79-86.

- At the hearing on June 25, 2021, before the first ALJ, a medical expert, psychologist Dr. Lillie McCain, testified. Based on her review of the record, she opined that Plaintiff had relatively benign anxiety, that panic attacks were not supported by the record and that Plaintiff's ADHD responded to treatment. Tr. 249-53. She found no impact from mental health symptoms on Plaintiff's ability to function. Tr. 252-53.

Post-remand and/or for the new claim, beginning in January 2023, five more medical opinions/findings were procured and/or submitted.

- In early January 2023, an SSA expert internist, Dr. W. Tyler Smith, performed a consulting examination and noted Plaintiff's very depressed affect, extensive tender points, complaints of pain in the abdomen, left shoulder, SI joint, and the inability to tandem walk. Dr. Smith found postural and lifting limits from left-side sciatic and shoulder pain, as well as that fibromyalgia "is likely chronic and would cause him to miss work." Tr. 1418-19.

- In late January 2023, SSA expert Dr. Thomas DeNucci reviewed the records, including Dr. Smith's report, and found Plaintiff to be limited to

sedentary work with the need for a sit/stand option up to three times an hour with significant postural limits and limited reaching with the left arm. Tr. 128-30.

- In mid-February 2023, an SSA expert psychologist, Dr. John Parsons, performed a consulting examination and noted Plaintiff's impaired speech, short attention/concentration span, distracted affect, questionable recall, emotional withdrawal, moderate anxiety and mild depression, as well as Plaintiff's report of serious physical impairments, including chronic diabetes and Guillain-Barre syndrome. Dr. Parsons opined that Plaintiff's ability to understand and remember, to interact with others, and to adapt to change are all markedly impaired, while his concentration is moderately impaired, although his primary concerns are his somatic issues. Tr. 1422-30. Dr. Parsons noted that Plaintiff walked out when questioned about whether he had had a psychiatric evaluation to determine his need for psychotropic mediations. Tr. 1423.

- In late February 2023, SSA expert psychologist Dr. Jeffrey Hughes reviewed the records, including Dr. Parsons' report, and found Plaintiff capable of working a normal "8/5/40" work routine, with moderate attention/concentration limits precluding the performance of complex tasks. Tr. 127-31. Dr. Hughes noted that Dr. Parsons' opinions "conflict with the recent MSE from Dr. Gaspar, are not supported by other psych MER, tend to be contradicted by the lack of treatment seeking bx, and are not fully consistent with the source's o[w]n MSE findings." Dr. Hughes concluded that Dr. Parsons' [o]pinions are not persuasive." Tr. 127.

- On October 6 and 11, 2023, Plaintiff's treating psychologist, Dr. Steven Hershey, signed two difficult-to read opinions, in which he opined that Plaintiff suffers from attention disorder, adjustment disorder and anxiety, but that he (Dr. Hershey) was "unable to answer" or "unable to rate" the questions regarding the severity of Plaintiff's mental health symptoms. Tr. 1735-38.

## II.    <u>Standard of Review</u>

As long as the correct legal standard is applied, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3); <u>see</u> <u>Purdy v. Berryhill</u>, 887 F.3d 7, 13 (1st Cir. 2018). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." <u>Biestek v. Berryhill</u>, 587 U.S. 97, 103 (2019). Substantial evidence

"means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). It is more than a scintilla and must do more than merely create a suspicion of the existence of a fact. Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). Further, while "more than a scintilla of evidence is required to meet the benchmark, a preponderance of evidence is not." Clark v. Kijakazi, 673 F. Supp. 3d 119, 122 (D.N.H. 2023) (cleaned up). The determination of substantiality is based on an evaluation of the record as a whole. Frustaglia v. Sec'y of Health & Hum. Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), aff'd, 230 F.3d 1347 (1st Cir. 2000) (per curiam); see Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (per curiam) (court must consider evidence detracting from evidence on which Commissioner relied).

Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); Lizotte v. Sec'y of Health & Hum. Servs., 654 F.2d 127, 128 (1st Cir. 1981). The Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret or reweigh the evidence or otherwise substitute its own judgment for that of the Commissioner. Thomas P. v. Kijakazi, C.A. No. 21-00020-WES, 2022 WL 92651, at *8 (D.R.I. Jan. 10, 2022), adopted by text order (D.R.I. Mar. 31, 2022).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g). Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3,

2015).  If the Court finds that a judicial award of benefits would be proper because the proof is

overwhelming, or the proof is very strong and there is no contrary evidence, the Court can

remand for an award of benefits.  Sacilowski, 959 F.3d at 433, 440-41; Randy M. v. Kijakazi,

C.A. No. 20-329JJM, 2021 WL 4551141, at *2 (D.R.I. Oct. 5, 2021), adopted by sealed order

(D.R.I. Oct. 28, 2021).

      Citing Loper Bright, 603 U.S. 369, Plaintiff asks the Court to adjust this standard of

review to tip it to be more consistent with the remedial purpose of the Social Security Act

without specifying how or why this Court may or should reject the controlling Supreme Court

and First Circuit decisions cited above in the context of this case.  See Rigsbee v. Commissioner

of Social Security, Case No. 1:24-cv-0644-JHE, 2025 WL 2810011, at *4 (N.D. Ala. Sept. 30,

2025) (because district court cannot reject existing law as articulated in controlling authorities,

Loper Bright "argument is beside the point").  To support the argument, Plaintiff relies on Duran

v. O'Malley, 754 F. Supp. 3d 251, 262 n.7 (D. Mass. 2024).  However, Duran does not address

the standard of review to be deployed by a court assessing an ALJ's decision as articulated in the

controlling authorities from the Supreme Court and the First Circuit Court of Appeals.  Rather, it

deals with the denial of review by the Appeals Council (resulting in egregious error) in reliance

on an agency regulation that injected a requirement missing from the applicable statute.  Id.

Further Duran cites Loper Bright as "likely" guidance, but not necessarily controlling authority,

noting that Loper Bright deals with Administrative Procedures Act cases, not those arising under

the Social Security Act.  Id.

      Because Plaintiff's Loper Bright argument is undeveloped, it should be rejected.

Ferguson v. Comm'r of Soc. Sec., Case No. 1:24-cv-875, 2025 WL 2712837, at *4 (W.D. Mich.

Sept. 3, 2025) (rejecting Loper Bright argument where claimant "fails to adequately explain how

[it] affects this case"), adopted, 2025 WL 2709804 (W.D. Mich. Sept. 23, 2025); Gregory G. v.

Bisignano, No. 1:23-cv-02439-GMH, 2025 WL 1824842, at *15 n.18 (D.D.C. July 2, 2025)

(rejecting claimant's "entirely undeveloped" Loper Bright argument).  Moreover, to the extent

that any of the controlling authorities cited above (e.g., Biestek, 587 U.S. 97; Sacilowski, 959

F.3d 431; Purdy, 887 F.3d 7) relied on Chevron, Loper Bright itself specifies that, "we do not

call into question prior cases that relied on the Chevron framework."  Loper Bright, 603 U.S. at

412.  Accordingly, "courts that have considered Loper Bright in the social security context have

concluded that it does not change the landscape in these cases."  Wright v. Comm'r of Soc. Sec.,

Case No. 1:24-cv-226, 2025 WL 665137, at *2 n.2 (W.D. Mich. Mar. 3, 2025); see June B. v.

Bisignano, C.A. No. 24-245-MRD, 2025 WL 1939087, at *4 n.9 (D.R.I. July 14, 2025)

(rejecting argument that Loper Bright has overruled cases establishing the standard of review

applicable to Social Security cases); Cameron B. v. Dudek, C.A. No. 24-CV-00176-MSM-LDA,

2025 WL 1348550, at *1 (D.R.I. May 8, 2025) (rejecting argument that Loper Bright has altered

"proper standard" applicable to Social Security Act cases).  Accordingly, the Court will be

guided by the controlling authorities establishing the applicable standard of review as set forth

above.

## III.    **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. § 416(i); 20 C.F.R. § 404.1505.[8]  The impairment must be severe,

---

[8] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Hum. Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite only to one set.

making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-06, 1509-11.

### A.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Sacilowski, 959 F.3d at 434; see Ulitsch v. U.S. Soc. Sec. Admin., Case No. 24-cv-00074-PB, 2025 WL 691054, at *4 (D.N.H. Mar. 4, 2025) ("claimant bears the burden at the first four steps to prove by a preponderance of the evidence that they are disabled").

### B.    Opinion Evidence

An ALJ must consider the persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 404.1520c.  The most important factors to be considered when the Commissioner evaluates the persuasiveness of a medical opinion are supportability and consistency; these are usually the only factors the ALJ is required to articulate.  20 C.F.R. § 404.1520c(b)(2); Elizabeth V. v. O'Malley, C.A. No. 23-00459-WES, 2024 WL 1460354, at *3

(D.R.I. Apr. 4, 2024), adopted by text order (D.R.I. Apr. 19, 2024).  Supportability refers to the quantum of relevant objective medical evidence and supporting explanations presented by a medical source to support the medical opinion or prior administrative medical findings; consistency refers to the degree to which a medical opinion or prior administrative medical finding is consistent with the evidence from other medical sources and nonmedical sources in the claim.  20 C.F.R. § 404.1520c(c)(1)-(2).  A medical opinion lacking adequate supporting evidence, or one that is inconsistent with evidence from other sources, is not persuasive regardless of who made the medical opinion.  See Amanda B. v. Kijakazi, C.A. No. 21-308MSM, 2022 WL 3025752, at *2 (D.R.I. Aug. 1, 2022), adopted, 2022 WL 18910865 (D.R.I. Nov. 7, 2022).  Other factors that are weighed in light of all of the evidence in the record include the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding.  See 20 C.F.R. § 404.1520c(a), (c).  However, the ALJ is required to articulate his consideration of factors other than consistency and supportability only when he has equally persuasive medical opinions or administrative findings about the same issue that are both supported and consistent but not the same; in that event, he is required to articulate the "other factors" that he relied on to resolve the conflict. 20 C.F.R. § 404.1520c(b)(3).

     **C.**     **Assessment of Claimant's Subjective Statements Including Pain**

     The ALJ must consider the claimant's subjective statements regarding the limitations caused by symptoms.  Steven A. v. O'Malley, C.A. No. 23-544-WES, 2024 WL 4344865, at *3–4 (D.R.I. Sept. 30, 2024).  Where an ALJ decides not to fully credit such subjective statements, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1998).  A

reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  However, in the absence of evidence that directly rebuts the claimant's testimony or presents some other reason to question its credibility, the ALJ must take the claimant's statements as true.  Sacilowski, 959 F.3d at 441.

As to statements regarding pain, Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  To comply with this requirement, an ALJ must consider a claimant's statements about pain and determine the extent to which they are reasonably consistent with the objective medical evidence but also may not disregard them "solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms."  SSR 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017); 20 C.F.R. § 404.1529(c)(3).  Thus, remand is required if the ALJ fails properly to perform the pain analysis, particularly where the claimant has sustained his burden of presenting a competent treating source opinion endorsing both the diagnosis of an impairment that causes subjective pain, as well as evidence of function-limiting pain.  Tegan S. v. Saul, 546 F. Supp. 3d 162, 171 (D.R.I. 2021).  In such circumstance, an ALJ's "'extreme insistence on objective medical fin[d]ings to corroborate subjective testimony of limitations of function because of pain' is error."  Dianne D. v. Berryhill, C.A. No. 18-312JJM, 2019 WL 2521840, at *7 (D.R.I. June 19, 2019) (quoting Avery v. Sec'y of Health & Hum. Servs., 797 F.2d 19, 22 (1st Cir. 1986)), adopted by text order (D.R.I. July 5, 2019).

IV.    **Analysis**

A.    **ALJ's Treatment of Opinions and Findings of Experts and Treating Providers**

1.    <u>Mental Health Opinions/Findings - Dr. Parsons/Dr. Hughes/Dr. Gordon</u>

In reliance on the Parsons report signed in February 2023, Plaintiff's primary argument is focused on mental health.[9]  He contends that the ALJ erred in finding that the one-time consulting examination report of Dr. Parsons is "less persuasive," Tr. 24, while finding persuasive the more recent findings of the non-examining expert psychologist, Dr. Hughes, as well as the older findings of the pre-remand non-examining expert psychologist, Dr. Gordon. Plaintiff does not challenge the ALJ's treatment of the many other mental health opinions/findings/observations in the record, including the ALJ's consideration of the treating records of Nurse Bianchino, Dr. Hershey[10] and Dr. Liss.  Nor does he challenge the ALJ's finding that Plaintiff is more limited mentally than is reflected in the mental health treating source opinion of Nurse Bianchino (who opined to no mental health work limits), which the ALJ found to be partially persuasive, and in the opinion of the testifying mental health expert, Dr. McCain (who opined to no mental health functional limits), which the ALJ found to be unpersuasive.

If persuasive, Dr. Parsons' opinions that Plaintiff has marked impairments in all spheres, except for attention/concentration (which Dr. Parsons found to be moderately impaired), would support a finding of disability.  At the threshold, the Court notes that there are several aspects of Dr. Parsons' report that are troubling.  First, Dr. Parsons notes that Plaintiff's "primary concerns"

---

[9] This is a switch – until Dr. Parsons signed his report opining to marked limits sufficient to establish disability, Plaintiff argued vociferously that his is a "pain and fatigue" case, not a mental health case.  Tr. 254.

[10] As noted *supra*, Dr. Hershey's treating notes are in the record and his RFC opinions reflect only that, despite a treating relationship of several months, Dr. Hershey was "unable to" answer/rate questions about the severity of Plaintiff's symptoms.  Tr. 1735-38.  Thus, the ALJ appropriately considered his treating records, but did not assign persuasive value to his opinions.  Plaintiff does not challenge this approach.

are somatic issues, yet the report reflects that Dr. Parsons relied on Plaintiff's statement to Dr. Parsons that he has "chronic diabetes . . . and Guillain-Barre syndrome," Tr. 1423, 1425, neither of which has ever been diagnosed as far as the record reflects.  Second, Dr. Parsons seems to have relied significantly on Plaintiff's soft, mumbling, difficult-to-understand speech; this observation is dramatically contradicted by the MSE reports in the treating record, which consistently reflect the observation that Plaintiff's speech is entirely normal.[11]  E.g., Tr. 726 (good eye contact, normal speech); Tr. 734 (cooperative, normal speech); Tr. 1388 (speech fluent and well-articulated); Tr. 1433 ("conversant, pleasant"); Tr. 1541 (cooperative, normal speech – "[n]ormal rate, rhythm, volume", fluid language).[12]  Third, Dr. Parsons' observation of depressed mood and restricted affect is similarly at variance with almost all of the treating record.  E.g., Tr. 734 ("mood is good, denies depression"); Tr. 751 (normal mood and affect); Tr. 1343 (adequate mood); Tr. 1444 ("[m]ood/[a]ffect [a]dequate,[c]ongruent"); but see Tr. 1542 (mood "not where I want it to be" and affect "[c]onstricted").  Also noteworthy is that, based on his observations, Dr. Parsons recommended that Plaintiff receive a psychiatric evaluation to assess his need for psychotropic medication, Tr. 1430, although the record reflects that such an evaluation was performed by a psychologist, Dr. Liss, four months later, but her report does not recommend psychotropic medication or any change in the treatment.  See Tr. 1541-42.

---

[11] The only other evidence reflecting that Plaintiff displayed such a depressed affect with difficulty answering questions is the consulting report written by Dr. Smith, who (like Dr. Parsons) saw Plaintiff once at approximately the same time for a consulting examination.  Dr. Smith found that Plaintiff "appears to be severely depressed . . . has difficulty answering questions, will not make eye contact, was somewhat uncooperative."  Tr. 1418.  As noted infra, Dr. Smith's observations are also at odds with the treating record.

[12] The record contains two references to abnormal speech, but neither is consistent with Dr. Parsons' observation of slow, soft and mumbling.  See Tr. 848 (speech "pressured" as Plaintiff speaks of fears regarding COVID-19 and related adjustments); Tr. 1476 (speech rapid/tense as Plaintiff speaks of stressful family incident).

Focusing particularly on the findings in the treating MSEs of the mental health specialists (Nurse Bianchino and Dr. Hershey), the other MSEs of record and Plaintiff's activities, the ALJ relied on the significant inconsistencies between this substantial evidence and the Parsons findings of marked limitations to reject those findings and to find the Parsons report to be "less persuasive." Tr. 24. The ALJ also noted that Dr. Parsons' report contains limited support for those findings, particularly the findings that Plaintiff is markedly impaired in his ability to interact with others and to understand, remember and follow instructions.[13] Thus, these findings appear to be supported only by Dr. Parsons' anomalous (in that it clashes with virtually every MSE of record) observation of Plaintiff's affect and soft, difficult-to-understand, mumbling speech. As the ALJ correctly points out, these findings differ dramatically from all other MSE observations of record and are inconsistent with Plaintiff's activities, including his marriage, gym attendance, monthly church attendance, educational attainments, volunteer work and other employment. The Court finds no error in ALJ's rejection of the "markedly impaired" findings in the Parsons report.

Plaintiff also launches a blunderbuss attack on the ALJ's reliance as persuasive on two of the non-examining mental health expert psychologists, post-remand, Dr. Hughes, and pre-remand, Dr. Gordon.

As to Dr. Hughes, on February 27, 2023, based on his review of a file that included both the Parsons and Smith reports, Dr. Hughes opined that, despite Plaintiff's pain and anxiety, he remains capable of working a "normal 8/5/40 work routine" with only moderate limitations due to interruptions from symptoms (that is, without excessive absenteeism). Tr. 131. Plaintiff

---

[13] As to understanding, remembering and following instructions, Dr. Parsons did not perform any testing of Plaintiff's cognitive functions so there are no such results to support this finding.

argues principally that the ALJ erred in relying on the Hughes findings because Dr. Hughes based them only on the normal MSE findings of one of the neurologists, Dr. Gaspar. This argument fails because it is inaccurate. In fact, Dr. Hughes simply used the Gaspar MSE to illustrate the point – that none of the MSEs in the treating record support limitations greater than those to which Dr. Hughes opined. As Dr. Hughes noted in his analysis of the Parsons report, the "[o]pinions . . . are not supported by <u>other</u> psych MER," as well as that they "tend to be contradicted by [Plaintiff's] lack of treatment seeking bx." Tr. 127 (emphasis added).

Plaintiff also argues that Dr. Hughes made several mistakes that taint his analysis. First, Plaintiff points to Dr. Hughes' brief summary of the confusing procedural journey of this case (with the voluntary remand) and argues that it somehow establishes that Dr. Hughes mistakenly relied on the first ALJ's decision as binding. The Court does not accept that interpretation; indeed, it makes no sense as the Appeals Council's remand (to which Dr. Hughes adverts) is the reason why Dr. Hughes was asked to review the file. Second, Plaintiff focuses on Dr. Hughes' note stating that the Parsons report was ordered because of the lack of "inpatient or outpatient treatment source records" and argues that this means that Dr. Hughes overlooked the Bianchino/Hershey treating records. Tr. 127. This argument also does not make sense. The focus of the Dr. Hughes note is on the lack of "inpatient or outpatient treatment source records" (triggering an order for a consulting examination) during the post-remand period when there unambiguously <u>was</u> a significant gap in Plaintiff's seeking or receiving specialized mental health treatment.[14] Nor does the Court credit Plaintiff's labeling as "professional hubris" Dr. Hughes'

---

[14] Plaintiff's argument that Dr. Hughes failed to consider the pre-remand treating notes of Nurse Bianchino does not advance Plaintiff's cause because Nurse Bianchino's notes and opinion consistently reflect her assessment that Plaintiff had no significant mental impairments as long as he was taking medication as prescribed for ADHD and insomnia. And the Hershey treating notes were not yet in the record when Dr. Hughes signed his opinions so the failure to consider them could not be error. Nor do the Hershey notes or the Hershey opinions support mental health limitations more severe than those reflected in the Hughes findings and the ALJ's RFC.

appropriate analysis of the disconnect between the Parsons MSE findings and the Parsons findings of marked limitations.  ECF No. 10-1 at 38.  To the contrary, Dr. Hughes' assessment that the Parsons MSE findings do not support the Parsons opinions is an important function of an expert on which the ALJ was entitled to rely.  There is no error in the ALJ's approach to the Hughes opinions.

As to Dr. Gordon, unlike the Hughes findings, which are even more recent than the Parsons report, Dr. Gordon performed his file review prior to the remand order and did not see the record as developed after he signed his opinion on October 5, 2020.  In considering the persuasiveness of these findings, the ALJ surveyed the mental health evidence, both that seen by Dr. Gordon, and not seen by Dr. Gordon, up to the most recent records from Dr. Hershey and Dr. Liss; the ALJ also appropriately considered Plaintiff's activities and the lack of any inpatient mental health treatment.[15]  In reliance on this substantial evidence, he appropriately found that "Dr. Gordon's assessment seems fairly reasonable."  Tr. 21.  The Court finds no error in this determination.

> 2.    Physical Opinions/Findings - Dr. Smith/Dr. DeNucci

At approximately the same time that the mental health consulting report from Dr. Parsons was ordered, an analogous physical report was ordered from an internist, Dr. Smith.  As with his presentation to Dr. Parsons, Dr. Smith found most noteworthy Plaintiff's affect, which he observed to be uncooperative and "severely depressed" with difficulty answering questions.  Tr. 1418.  As noted *supra*, these observations clash with virtually every MSE of record.  E.g., Tr. 734 (cooperative, normal speech, no depression, little anxiety).  Further, Plaintiff reported to Dr.

---

[15] The Court rejects Plaintiff's contention that the ALJ "leaned heavily" on inpatient psychiatric treatment as the "primary measure of symptoms validity."  ECF No. 10-1 at 39.  The ALJ's thoughtful analysis clearly treats that as only one factor to be considered.

Smith a "history of severe depression and [that he] has been hospitalized once for that."  Tr.

1416.  As far as the record before the Court reveals Plaintiff's history, this is inaccurate.  See,

e.g., Tr. 18 (ALJ's unrebutted finding of no inpatient psychiatric treatment); Tr. 251-53 (based

on file review, testifying mental health expert opines that MSEs are largely normal and there is

no evidence of diagnosed depression); Tr. 946 (treating psychiatric nurse does not diagnose

depression); Tr. 1443, 1476 (treating psychologist lists active issues as stress concerns,

"legal/disability" and family issues, not depression); Tr. 1539-43 (psychologist's evaluation

notes history of ADHD, anxiety and adjustment reaction, not depression).  Further, Dr. Smith's

primary finding – that the fibromyalgia pain flares would cause Plaintiff to miss work to an

unspecified degree – is based not just on the prior diagnosis of fibromyalgia, but also on Dr.

Smith's own finding of "positive trigger points in all areas"; the latter finding clashes with the

findings of no trigger points made by all three treating rheumatologists (Dr. Dalal, Dr. Tokay and

Dr. Maher).  Tr. 1418.

Importantly, the ALJ found the Smith opinions to be partially persuasive and relied on

significant parts of them.  Tr. 23.  Specifically, the ALJ accepted Dr. Smith's opinion that

Plaintiff is significantly limited in his ability to perform postural activities and carry loads,

although for the degree of limitation (which Dr. Smith did not include), the ALJ relied on Dr.

DeNucci's detailed RFC analysis, which was prepared in reliance, *inter alia,* on the Smith report.

The ALJ rejected only as "overly restrictive" Dr. Smith's opinion that Plaintiff would miss work

due to fibromyalgia flares, relying instead on the DeNuccio/Hughes findings that, despite

fibromyalgia and the objective findings in the Smith report, which were accepted, Plaintiff

remained capable of sustaining work attendance, albeit at a sedentary exertional level with

significant additional limitations.  Tr. 23.  The ALJ appropriately assessed the Smith "missing

work" finding as both inconsistent and unsupported in reliance on the ALJ's own detailed review

of the substantial evidence (Tr. 13-19), including the medical evidence, the evidence of

Plaintiff's activities, Plaintiff's improvement with treatment and Plaintiff's decision not to

proceed with injections.  The Court finds no error in the ALJ's approach.  Ana D. v. O'Malley,

C.A. 23-387WES, 2024 WL 3886655, at *5 (D.R.I. Aug. 20, 2024) (no error when ALJ accepts

diagnosis of fibromyalgia and appropriately focuses on intensity and persistence of pain and

other symptoms and whether treatment changes once fibromyalgia is diagnosed; complaints of

pain alone do not suffice and "mere diagnosis of a condition says nothing about its severity")

(internal quotation marks omitted).

      Plaintiff's attack on the ALJ's reliance on the DeNucci findings, which he found to be

persuasive, is laser-focused on left-side reaching.  Thus, based on "chronic L shoulder pain," Dr.

DeNucci found:

| Reaching in front and/or laterally | Limited left |
|---|---|
| Reaching overhead | Limited left |

Tr. 129.  These findings do not specify the degree of this limitation; as adopted by the ALJ, this

limitation became: "[h]e could perform frequent reaching in all directions including overhead,

with the left upper extremity."  Tr. 12.  Plaintiff argues that Dr. DeNucci's finding must be

interpreted as barring any reaching, leaving the ALJ's RFC unsupported.  This argument fails not

only because that is not what the DeNucci finding says, but also because, as the ALJ found, Tr.

15-16, the treating record reflects, for example, Plaintiff's shoulder pain affecting work as

reported to a primary care provider in February 2021, but was not mentioned at the next primary

care appointment in May 2021.  Compare Tr. 914 (on February 11, 2021, "[h]aving a hard time

at work and at home, because" of left arm pain, although "LUE . . . [s]trength/sensation/ROM

intact"), with Tr. 944 (on May 13, 2021, Plaintiff does not mention shoulder pain and no findings regarding extremity on examination).  Thus, in his decision, the ALJ appropriately marshalled evidence of complaints of shoulder/arm pain juxtaposed with observations of normal range of motion/intact strength/sensation in the shoulder/upper extremities to support his reaching limitation.  Tr. 16 (citing e.g., Tr. 1023-24 (Plaintiff complains of stiffness, *inter alia*, in shoulders; on examination, provider finds full range of motion in shoulders and normal extremities; no mention of shoulder or arm pain in assessment or treatment plan)).  Further, Plaintiff points to no evidence and no opinion or finding from any treating provider or expert (including Dr. Smith) who noted observations consistent with such an extremely restrictive interpretation of the DeNucci finding for left-side reaching.  Accordingly, the Court finds that the ALJ's reaching limitation is well supported by substantial evidence.

3.    Duty to Recontact Dr. Pasquarello/Error in Reliance on
       Pasquarello over Smith

Early in the period in issue, Dr. Pasquarello, the treating orthopedist, opined that Plaintiff can return to work, albeit with limitations, including a limitation on "[n]o repetitive bending or twisting."  Tr. 753.  The ALJ accepted Dr. Pasquarello's opinion as just partially persuasive because the ban on "[n]o repetitive bending or twisting" does not specify how frequently Plaintiff would be able to bend/twist.  Tr. 22.  Instead, the ALJ took the contour of the limitation from more recent findings of Dr. DeNucci, who opined that Plaintiff could "stoop[] (i.e., bending at the waist)" "[o]ccasionally."[16]  Tr. 129.  In any event, ALJ's adoption of a less-than sedentary work limitation embeds the accommodation to which Dr. Pasquarello opined because sedentary

---

[16] As the Commissioner points out, "occasionally" can mean as little as "very little."  SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

work "does not require repetitive bending [or] twisting."  Watkinson v. Colvin, Civil No. 12-cv-501-JL, 2013 WL 6157857, at *2 (D.N.H. Nov. 25, 2013).

Plaintiff's challenge to the ALJ's approach to the Pasquarello opinion is confusing.  In his heading, Plaintiff seems to argue that the ALJ was required to recontact Dr. Pasquarello to ask him to clarify how much bending/twisting he contemplated by his opinion banning any "repetitive" bending/twisting.  This argument fails because recontacting a medical source is only one way that an ALJ in his discretion "may" choose to resolve such an issue.  20 C.F.R. § 404.1520b(2)(i).  The Court finds no error in the alternative (and well supported) approach that the ALJ used instead.  Somewhat inconsistently, in the text of his argument, Plaintiff appears to shift, arguing only against reliance on the less recent Pasquarello opinion (a specialist opining based on treatment over an extended period) that Plaintiff could work because it undermines the more recent opinion of Dr. Smith (an internist opining based on a single encounter) that Plaintiff would miss work to an unspecified degree.  At bottom, while the ALJ accepted most of the Smith opinion, he relied on the even more recent persuasive findings of another internist, Dr. DeNucci, as well as the persuasive findings of Dr. Hughes and the other substantial evidence of record, including the older Pasquarello opinion, to reject the Smith opinion to the extent that it may be interpreted as endorsing excessive absenteeism.  This is not error; indeed, it is consistent with the ALJ's job of weighing the substantial evidence, including opinions, and reaching a decision.  Shiebler v. O'Malley, 761 F. Supp. 3d 235, 248 (D. Mass. 2024) (ALJ's summary description of relevant evidence is adequate support for ALJ's acceptance of some medical opinions and rejection of others); see Julie D. v. O'Malley, No. 23-00182-WES, 2024 WL 208398, at *7-8 (D.R.I. Jan. 19, 2024) (court rejects plaintiff's challenge to ALJ's evaluation of

record to make supportability and consistency findings as inappropriate request to reweigh evidence in manner more favorable to her).

No matter which of Plaintiff's arguments is considered, the Court does not find that error tainted any aspect of the ALJ's approach to the Pasquarello opinion.

### B.    ALJ's Analysis of Plaintiff's Subjective Statements

Plaintiff argues that the ALJ failed to marshal substantial evidence that contradicts Plaintiff's testimony to support his finding that Plaintiff's subjective statement about his physical and mental symptoms should be discounted.

Having reviewed the entirety of the record to assess whether a reasonable mind could accept that there is substantial evidence adequate to support the ALJ's conclusions, the Court notes its own observation that Plaintiff's testimony before the second ALJ and his statements to Dr. Parsons[17] (who relied on them) are tainted by his claim that he suffers from Guillain-Barre Syndrome even though it has never been diagnosed by any provider.[18]  This record further has references by treating providers questioning or contradicting Plaintiff's complaints regarding the severity of his symptoms.  E.g., Tr. 946-49 (Nurse Bianchino opines that Plaintiff is "rarely" unable to work in full-time setting); Tr. 1085 (Dr. Tokas notes "questionable effort" during examination to assess strength, finds claims of pain out of proportion to findings, declines to diagnose fibromyalgia, instead noting potential diagnosis of hypochnodiasis).  Thus, this is far from being a case where there is not substantial evidence directly contradicting the claimant's subjective statements or another reason to question their credibility.  See Sacilowski, 959 F.3d at 441.  The Court also notes that this is not a case like Tegan S., 546 F. Supp. 3d at 171 where a

---

[17] Plaintiff also reported to Dr. Parsons that he is diagnosed with chronic diabetes, Tr. 1425, which is not true.

[18] In March 2023, Plaintiff also told Dr. Hershey that he has "guille barre syndrome."  Tr. 1452.

competent treating source endorsed not just the diagnosis of an impairment (fibromyalgia) that is expected to cause subjective pain, but also opined that the pain seriously limited the claimant's ability to function.  There is no such treating source opinion in this case.

Focusing more particularly on the ALJ's analysis, the Court finds that the ALJ's extensive summary of the substantial evidence of record – including largely normal findings and entirely conservative treatment – is adequate to support the proposition that the credibility determination is appropriately based on substantial evidence that either contradicts or fails to substantiate the subjectively claimed limitations.  To illustrate with just one example, the ALJ noted Plaintiff's testimony at both the 2021 and 2023 hearings that he experiences debilitating panic attacks that occur at least a couple of times each week, sometimes last for hours, and are triggered by social situations.  Tr. 12-13.  This testimony juxtaposes with the mental health treating record as accurately summarized by the ALJ, which is devoid of any such finding.  Tr. 17 (citing, *inter alia,* Tr. 1537 (during psychiatric evaluation with Dr. Liss, "[d]enies panic attacks")).  The Court finds that the ALJ's analysis is more than sufficient to comply with the credibility strictures of Sacilowski.

## V.    Conclusion

Having reviewed the entirety of this extensive record mindful that it is the Court's "job . . . to . . . review the record and determine whether a reasonable mind . . . could accept it as adequate to support [the ALJ's] conclusion," Burton v. Kijakazi, Civil Action No. 21-cv-11916-ADB, 2023 WL 2354901, at *8 (D. Mass. Mar. 3, 2023) (internal quotation marks omitted), the Court finds that remand – either for further proceedings or for an award of benefits as Plaintiff seeks – is not appropriate and affirms the ALJ's well supported and legally correct decision. Based on the foregoing, Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF

No. 10) is DENIED and Defendant's Motion for an Order Affirming the Decision of the

Commissioner (ECF No. 12) is GRANTED.  The Clerk is directed to enter judgement in favor of

Defendant.

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
October 14, 2025